LAW OFFICES

# DAVID WIKSTROM
950 THIRD AVENUE - 32ND FLOOR
NEW YORK, NEW YORK 10022

E-MAIL: DAVID@DAVIDWIKSTROM.COM
WWW.DAVIDWIKSTROM.COM

TELEPHONE: (212) 248-5511
FACSIMILE: (212) 248-2866

April 23, 2021

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  United States v. Jonatan Correa, *et al.*
20 CR 18 (RMB)

Dear Judge Berman:

This letter and its exhibits are submitted in mitigation of sentence for Jonatan Correa. Mr. Correa pleaded guilty to Count One of the Indictment on January 12, 2021. That count charged him with conspiring to commit copyright infringement, in violation of 18 U.S.C. §§ 371 and 506; sentencing is scheduled for May 11, 2021.

The Presentence Report dated April 5, 2021, in accordance with the parties' plea agreement and Guidelines Stipulation, calculates a final offense level of 13, carrying a presumptive imprisonment range of 12-18 months. The Probation Department recommends 6 months' imprisonment, to be followed by Supervised Release conditioned upon, *inter alia*, 6 months' home confinement. (*See* PSR, ¶¶ 37, Addendum, p. 20.)

For the many reasons set forth in more detail below, I believe that the Court should grant a variance under 18 U.S.C. §3553(a) and fashion a non-incarceratory sentence. These reasons include:

1. The Defendant is a nonviolent first offender with a lifetime of gainful employment. He lives with and supports his family, including his wife, child and grandchild. From his beginnings as a house painter for his brother's company at age 21, he now, 16 years later, owns and manages two companies, First Impression Painting and First Impression Drywall, which work on projects throughout Kansas and

Missouri, and which have 32 full-time employees and dozens of other subcontractors, who likewise support families.

2. His offense—unlike the vast majority of federal crimes, and in particular criminal copyright infringement offenses—was not motivated by pursuit of financial gain, and in fact Mr. Correa lost money committing it. As explained below, money was not the point; it was a hobby, verging on compulsion: to gain entry to and acceptance in The Scene, to be the first to copy and upload a release into a purportedly members-only, secretive club. To the extent the Motion Picture Association suffered losses of $54,000, which Mr. Correa has agreed are attributable to his conduct, he will make restitution in full immediately upon the Court's entry of a restitution judgment.

3. Mr. Correa's involvement was not comparable to that of either of his named coconspirators, who allegedly were organizers of the conspiracy. The conspiracy, referred to in the Indictment is alleged to have begun in 2011; Mr. Correa's infringement conduct didn't begin until 2017. While he readily admits infringing acts—copying DVD and Blu-Ray discs and uploading the digital copies to servers controlled by the organizers—he did so pursuant to instructions from his superiors, using commercially-available equipment they told him he would need, software they provided, and using discs they either sent to him or discs they had him purchase on his own from Best Buy and internet retailers. He did not sell copies into the market; indeed his understanding was that selling his copies into the market would cause him to be banned from the group.

4. Mr. Correa's personal and family circumstances, which are detailed in a separate letter to the Court, as to which filing under seal is requested.

**The Defendant and his Offense Conduct**

Mr. Correa was born in Florida in 1984, the youngest of seven children. At 3 his mother moved with the children to Kansas City, where her brother lived, to escape her husband's alcoholism and abuse. (PSR ¶ 46.) His mother, a first-generation immigrant from Colombia, struggled to find work, and Mr. Correa collected and recycled bottles and cans to help pay for the family's food and for his own school lunches. Despite poverty and strife during his formative years, however, Mr. Correa recalls a "positive upbringing and close relationship with his mother and siblings during [early childhood]," and that his mother "always provided for the family's basic needs." (PSR ¶ 47.)

It did not last, however; or, as Mr. Correa explained to the Probation Department, it lasted until religion "got in the way" (PSR ¶ 48). Mr. Correa's mother, a devout Jehovah's Witness, raised the family with the intense indoctrination and isolation that that church espouses. Among other tenets, Mr. Correa was taught that secular society was corrupt and Satanic, and he was forbidden to have social relationships outside the church. As he matured and began to question his family's faith, tension grew and Mr. Correa gradually achieved pariah status within his own family.[1] He was forbidden to have everyday social interactions outside the home, and at the same time was reproached by his own family inside it.

As a teenager, however, he found an outlet: computers, the internet and—of particular relevance given his present circumstances—secretly viewing all of the movies and television shows that were forbidden at home. He scoured online sources of TV shows and movies, spent hours in front of his screen night after night, and gradually made anonymous acquaintances and, ultimately, a network of friends from that world. Eventually he found an online group named Third Party DVD ("THP") that uploaded and made available movies and shows copied from DVDs, and after a period during which he was just a viewer, he began working for it as a "racer," *i.e.,* by spreading THP releases to other FTP servers.

But after he graduated high school, Mr. Correa quit. And for the next eleven plus years of his life—a period that included the 2011 inception of the conspiratorial activity alleged in Count One—he had nothing whatever to do with the online video world. His first job out of high school was for Comcast as a cable technician (2003-05), and then for the next four years worked in his brother Alberto's construction and painting company, first as a painter, then crew leader, and eventually superintendent. In 2009 Alberto's company was suffering financially and shrinking its workforce; Mr. Correa moved to Florida and went to work for his oldest brother Julian as a house painter.[2] He then started his own industrial painting business in Florida, and by working 12 hours days throughout the year with no time off, year after year, was eventually earning approximately $80,000 annually.

But, believing that his potential earnings were capped as a house painter—after all, he couldn't work longer hours than he already was—and hoping to better his prospects, he enrolled in early 2012 in ITT Technical Institute, to achieve an Associates degree in science, with a concentration in Network Management. For the

---

[1] When his sister Ruth, two years his senior, began dating someone outside the church, she was shunned, and when Mr. Correa took her side, he was too. (PSR ¶ 48.) Ultimately he was disfellowshipped (*i.e.* expelled) from the church, and his mother announced that she no longer considered him her son (*id.*). Her grudge persists to this day; for example, she refused to attend Mr. Correa's wedding earlier this year because of it. (PSR ¶ 49.)
[2] The move also allowed him to help his sister Ruth, who had relocated to Florida after she had been disfellowshipped by the family. (PSR ¶ 50.)

next two years, taking night and weekend classes in mathematics, programming, Linux, client-server networking, IP networking, physical networking and group theory, and so on, he displayed remarkable aptitude. He graduated in December 2013, the valedictorian of his class.

In 2014 he returned to Kansas to work again for his brother Alberto as a project manager. His efforts to find a job in IT or network management succeeded only in locating entry-level opportunities, where he would make much less money than as a painter. So he stuck with painting. In 2017 Alberto retired, and Mr. Correa bought the company from him, assuming an existing indebtedness of $720,000 payable in $10,000 monthly installments, a debt he is still paying off. By working constantly he has grown the business, and today there are two companies, a painting company and a construction company, with a combined payroll of 32 full-time employees, dozens of subcontractors, with projects spread throughout Kansas and Missouri.

In 2014 Mr. Correa returned to online TV and movies. During his last semester at ITT in late 2013, he had conversations with other students about the availability of media on popular torrent websites like piratebay.com and iptorrents.com.[3] For the next two to three years, he began browsing those sites as a consumer only, downloading movies and shows for his own library, and sharing them with his family and a few friends. In late 2016, he decided to see if any of the friends from his high school years were still around, much like an average Facebook user might, using Internet Relay Chat (IRC), a text-based and encrypted communication medium commonly used in discussion forums, and he eventually found a friend from a decade before, still using the same screen name, "Silent." Silent ultimately told Mr. Correa that he knew someone "looking for TV," i.e. someone looking for a supplier of pirated TV shows. He introduced Mr. Correa to "Artist," a member of the Sparks release group.

Artist told Mr. Correa that he ran the Sparks group along with several others, all of which were groups in "The Scene." The Scene is a collection of release groups maintaining topsites, *i.e.* secret and protected FTP servers, containing thousands of terabytes of copyrighted material. Unlike torrent sites, which anyone can access, access to Scene servers was limited to existing members, and membership itself required an invitation from an existing member plus lengthy vetting thereafter. Although rapid dissemination of material among affiliate Scene servers was a given, dissemination to torrent sites, and/or selling material, was supposedly forbidden (though as Mr. Correa knew, material was frequently leaked). Artist said that he had other members supplying TV content, but wanted "coverage" of other shows. Mr. Correa was associated with the Fleet group and began recording TV shows in his

---

[3] Torrent sites, of which there are hundreds, are public websites where anyone can download pirated content.

own home, and also had access—arranged by Artist—to a TV live stream in another member's home; typically he recorded 4 or 5 TV shows per night, *i.e.*, the only hours of the day that he wasn't painting houses or sleeping.

In 2017 Artist switched Mr. Correa from TV to DVD and Blu-Ray, and switched him from the Fleet group to Sparks group.[4] Artist told him, step-by-step how the process worked: the DVD or Blu-Ray disc would either be sent to him at his home, or he could buy it himself from BestBuy, or simply order it from www.cnl.com, an online Canadian video store.[5] Commercially available software was used to copy the material (*e.g.*, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆), encoding software supplied by Artist was used to encode the data for uploading, and it was then uploaded to an FTP site. Others then rapidly moved the files to affiliate sites and announced the release.

If this seems like an inordinate amount of effort: to make a digital copy of a previously-released movie, then encode it and upload it to another site, so that it would be available for download some days or weeks before it could be purchased on Amazon for $10, Mr. Correa—in retrospect at least—would be the first to agree. He spent hours out of every night, spent thousands of hard-earned dollars for equipment, and mostly copied DVDs that he paid for himself. At the same time, he went to movie theatres to see films, and he paid for subscription services like Netflix, Amazon, HBO, and Hulu anyway. As noted already, he had no financial incentive for any of this. Instead it was a chance to display his technical proficiency, to claim bragging rights for being the first computer nerd among many to upload a high-quality duplicate which met the Scene's exacting standards,[6] ultimately to garner the acceptance and respect of his peers.

Granted, infringement of copyrighted material causes losses even if not motivated by financial gain, and those losses ($54,000) drive the calculation of the Sentencing Guidelines in Mr. Correa's case. Nevertheless this fact is relevant to the

---

[4] Mr. Correa assumes that the time spent on TV shows was the period necessary to establish trust within the group, and for him to display his technical proficiency.

[5] The indictment alleges that fraudulent misrepresentations were made in obtaining the DVDs. Mr. Correa never did that. He established an account at cnl.com by simply calling and asking for one; the account was in his name, paid for with a credit card in his name, and the DVDs were sent to him at his home. It is possible, of course, that certain DVDs were "pre-release" in the sense that the DVDs had been released in Canada before the United States, as commercial DVD release dates vary by region and according to the marketing plan of the distributor. Nor does he know how Artist sourced the discs he had sent to Mr. Correa's home. In all events, he believes that all of these occurred after the theatrical release of the movie in question.

[6] Ironically for a group that prided itself on exclusivity and secrecy, it made no secret of its exacting standards for releases (*see* ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆) and even published its elaborate system of rules (*see* ▆▆▆▆▆▆▆▆▆▆▆▆▆).

issue the Court's ultimate determination of sentence and its consideration of the
§3553(a) factors, the issue to which I now turn.

### Argument

The publicity attendant to the takedown of the Sparks Group[7] in September
2020 elided critical distinctions between Mr. Correa and his codefendants in terms of
their role, their motivations, the need for deterrence, and considerations of potential
disparity. Granted that copyright infringement is a chronic scourge to industry, and
that the filing of this indictment and the disabling of the Sparks Group servers were
significant events in law enforcement efforts to eradicate it, nevertheless general
deterrence is but one of many factors the Court must consider. Jonatan Correa's
sentencing should be an individualized determination of the appropriate extent of
punishment, "a unique study in the human failings that sometimes mitigate,
sometimes magnify, the crime and punishment to ensue," (*Pepper v. United States,* 131
S.Ct. 1229 (2011).

Infringement of copyrighted material is widespread, and there are thousands
of individuals who do what Jonatan Correa did, along with millions of individuals
who consume this material on a daily basis. For a sense of the extent of it,
www.predb.org compiles a moment-by-moment list of the latest offerings, typically
approaching 15,000 items per day. There is nothing about it that commends itself to
the court. For Jonatan Correa, the offense conduct was an aberration in an otherwise
law-abiding life. He is a good, kind, humble and hard-working man. From difficult
beginnings he has fashioned a life and career he is justifiably proud of, a life that is
much broader than one would appreciate by referring solely to the period of his
offense conduct. I therefore ask the Court to fulfill its obligations as a sentencing
judge by considering the entire picture, carefully considering the information
contained in this letter, the anguished letters of Mr. Correa's family and friends that
are attached, and the overarching goals of Section 3553: punishment, deterrence, and
rehabilitation.

### 1. Role

The Sparks Group existed for a decade and more; it persists to this
day.[8] Mr. Correa's offense conduct, on the other hand, began in 2017 and ended on
March 11, 2020, nearly six months before he was charged, when law enforcement

---

[7] *e.g.,* "The alleged leaders were identified as Umar Ahmad, George Bridi and Jonatan
Correa," Voice of America, 8/26/20 (available at https://www.voanews.com/usa/us-
charges-3-alleged-be-behind-global-video-piracy-ring).
[8] "'Pirate' Releases Recover from Historic Drop Caused By Scene Busts,"
https://torrentfreak.com/pirate-releases-recover-from-historic-drop-caused-by-scene-busts-
210128/.

agents executed a search warrant at his home, following which he simply disappeared from the Scene. Unlike his codefendants, who are both alleged to be organizers of the scheme, and who participated far longer, Mr. Correa's participation was entirely fungible. He was told how to perform it, provided with the necessary software, told which DVDs to purchase and copy, and told what to do with the copies. The loss figure alleged in the indictment, "tens of millions" (Indictment, ¶ 1, p. 2), implies that the stipulated losses attributable to Mr. Correa's own conduct, $54,000, represent 0.27%—or less—of the total.

## 2. <u>Motive</u>

As already noted, he didn't do it for the money.  This was his hobby, his compulsion. He worked all day, spent time at home in the evenings with his wife, and then after she went to bed, spent hours in front of the computer competing to be the fastest to upload a copy of a DVD to an FTP server. It was, in fact, a precise reenactment of his teenage years, sneaking onto the internet to watch movies after his mother and siblings went to sleep.

I do not suggest that this was some form of diminished capacity. That he derived gratification by displaying his mastery of a technical skill to the hundreds or thousands of identical individuals around the globe doing the same thing does not diminish the fact that he knew it was wrong. However the fact that he didn't do it for money, that throughout the duration of the offense conduct—indeed throughout his entire adult life—Mr. Correa maintained legitimate employment and met without fail his adult obligations, is relevant at sentence because it evinces a diminished need for the sentence to ensure specific deterrence. The Sentencing Guidelines explicitly recognize this,[9] providing for a reduction in offense level where, as here, the offense is not committed for personal financial gain. (U.S.S.G. § 2B5.3(b)(4)).

Mr. Correa has left this world twice. After high school, he went to work and for more than eleven years had nothing to do with it. And after his home was searched and computers seized in March 2020, he simply and abruptly stopped. As he has demonstrated his ability and motivation to cease the offense conduct, and since he does not rely on it to meet his financial obligations, there is a correspondingly reduced need for the sentence to be severe to deter him from recidivism.

---

[9] Prior to 1998, it was not clear whether a copyright infringement offense committed without financial motivation violated the law. At that time, 17 U.S.C. § 506(a) required proof that defendant infringed a copyright willfully "and for purpose of commercial advantage of private financial gain." Congress addressed this in December 1997, passing the No Electronic Theft Act, and adding a provision to 17 U.S.C. 506(a) making it a crime to infringe a copyright willfully by reproducing or distributing one or more copies of copyrighted works worth more than $1000 — thus eliminating the requirement of proof of commercial or financial motivation.

### 3.  A Sufficient Sentence Under §3553

Section 3553(a)(2) requires that the sentence be "sufficient, but not greater than necessary:"

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence for criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.

A number of these are plainly inapplicable to Mr. Correa. He is not a recidivism risk, and the sentence need not be calculated to protect the public from further crimes at his hand. He needs no educational or vocational training, and needs no correctional treatment.

On the other hand, providing just punishment, reflecting the seriousness of the offense, promoting respect for the law, and providing general deterrence to others who might engage in criminality are, just as plainly, relevant to Mr. Correa's admitted misconduct. As to those, however, I believe that adopting the Probation Department's recommendation and sending Mr. Correa to prison for six months is unnecessary and unwarranted. First, Mr. Correa is already facing serious punishment: he has endured a highly-publicized arrest and prosecution, with all of the stigma that inevitably attach to them; he will spend a period of years under Court supervision with significant restrictions; he will lose valuable civil rights; and he faces financial penalties of at least $54,000.[10]

Mr. Correa lives with and supports his wife, his wife's daughter and his wife's granddaughter. He manages every operation of his businesses, including bidding, contract negotiation, staffing, oversight, and customer relations. The dozens of people he employs are similarly reliant on him. To imprison him for six months as an example to others would risk permanent damage to the careers and well-being of all

---

[10] *Cf. All-Star Marketing Group v. Media Brands Co., Ltd*, 775 F.Supp.2d 613 (S.D.N.Y. 2011), wherein this Court, in a civil judgment for infringement, held that an additional award of $25,000.00 was sufficient "to impress upon [Defendants] that there are consequences for [their] misconduct and serve as a specific deterrent to Defendants and as a general deterrent to others who might contemplate engaging in infringing behavior in the future."

of them, in effect turning a solution—a path of gainful employment, shouldering of responsibilities, attendance to the needs of others—into a myriad of problems.

And lastly, Mr. Correa suffers from hypertension and obstructive sleep apnea. (PSR ¶ 55). Hypertension is the highest comorbidity factor with COVID-19 deaths. (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7098485/). Sleep apnea has also been identified as a comorbidity. (https://www.ajmc.com/view/obstructive-sleep-apnea-linked-with-higher-risk-of-covid-19-hospitalization-complications.) Numerous district courts in this and other districts, including this Court,[11] have imposed reduced sentences or have granted Compassionate Release and ordered sentenced inmates to be released from prison based on hypertension causing an inmate to be at high risk of COVID-19 complications. (*See, e.g., United States v. Adam Field*, No. 18 Cr. 426 (JPO), Dkt. No. 38 (S.D.N.Y. May 4, 2020)  (granting release to child pornography defendant with hypertension and "nonphysical health conditions" incarcerated at FCI Danbury); *United States v. Sawicz*, No. 08-cr-287, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020) (releasing child-pornography offender with hypertension incarcerated at FCI Danbury); *United States v. Terrell Brown*, No. 16 Cr. 326 (ARR), ECF Dkt. 515 (E.D.N.Y. Apr. 25, 2020) (granting compassionate release over government's objection to defendant who suffered from hypertension); *United States v. Alexaner Salvagno*, No. 02 Cr. 51 (LEK), ECF Dkt. 1166 (N.D.N.Y. Apr. 23, 2020) (granting release to hypertensive defendant with 6 years left on sentence, who had hypertension)).

As the Court knows, Mr. Correa has recovered from COVID-19; in fact he was arrested in this case while suffering from it. But having had COVID-19 does not foreclose the Court from granting relief, as COVID-19 has been shown not to prevent reinfection; and neither does it protect against variant strains. (*See, e.g., United States v.* Cameron, 16 CR 212 (LAK), Mar. 25, 2021, "Cameron already has contracted and fortunately recovered from COVID-19. Nevertheless he has a serious comorbidity and, while cases of COVID reinfection are rare, the increasing prevalence of highly infectious variants has created concern as to whether the prior rarity of reinfection will continue.") Prisons are tinderboxes for infectious disease. Inmates cannot take precautionary measures recommended by the CDC to avoid the virus, including social distancing, avoiding contact with infected persons, regular hand hygiene, and sanitizing their living spaces, among other measures. Indeed, former Attorney General Barr and the United States Congress both recognized that home confinement for low-risk prisoners is a priority to help minimize the rate of infection and risk from COVID-19. *See*, "Memorandum for Director of Bureau of Prisons: Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic," Office of Attorney General, Mar. 26, 2020 (prioritizing home

---

[11] *United States v. Morgan,* 19 CR 209 (RMB), this Court imposed a sentence less than one-half of low end of guidelines range due in part to harsh conditions of imprisonment during pandemic.

confinement and noting that "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities"); Coronavirus Aid, Relief, and Economic Security (CARES) Act 2020, Pub. L. No. 116-136, 116th Cong., Title VI § 12003, pg. 634 (2020)(amending 18 U.S.C. § 3624 (c) to eliminate time limits on the use of home confinement for the duration of the COVID-19 crisis).

### Conclusion

For the foregoing reasons I respectfully submit that the Probation Department's recommendation should not be followed, and that Mr. Correa should be sentenced to a non-custodial sentence. In the event the Court disagrees believes a short custodial term is warranted, I ask that the Court fashion an equivalent incarceration alternative, such as home incarceration for a period the Court deems appropriate.

Jonatan Correa is a stable, employed, modest, and family-oriented man, who already is what we hope everyone who comes into the criminal justice system will become: a law-abiding, responsible, productive individual, an individual who has learned to put obligations and the needs of loved ones first, an individual who can defer gratification and lead a conscious life. I ask the Court to permit that to continue.

Respectfully submitted,

David Wikstrom

10