LAW OFFICES
# DAVID WIKSTROM
5 COLUMBUS CIRCLE - 11TH FLOOR
NEW YORK, NEW YORK 10019

**MEMO ENDORSED**

E-MAIL: DAVID@DAVIDWIKSTROM.COM
WWW.DAVIDWIKSTROM.COM

TELEPHONE: (212) 248-5511
FACSIMILE: (212) 248-2866

May 17, 2022

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> Let's discuss at forth-
> coming (5/26/22) super-
> vised release h'anng.
> Transcript of prior h'anng
> attached.
>
> SO ORDERED:
> Date: 5/18/22   /s/ Richard M. Berman
> Richard M. Berman, U.S.D.J.

Re: United States v. Jonatan Correa
    20 CR 18 (RMB)

Dear Judge Berman:

I write to request that the Court order the early termination of the 27-month term of Supervised Release that Mr. Correa is currently serving, pursuant to 18 U.S.C. §3583(e)(1). That section provides in pertinent part that

> [t]he court may, after considering the factors set forth in section [3553(a)(1)–(a)(7)] terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice.

Mr. Correa was arrested in Kansas on August 26, 2020, pursuant to a warrant issued the day before in the Southern District of New York. The warrant was based on an indictment charging him with conspiracy to produce and distribute copyright-infringing material, in violation of 18 U.S.C. §371, 17 U.S.C. §506, and 18 U.S.C. §2319. He pleaded guilty on January 12, 2021, and on May 19, 2021 he was sentenced to 27 months' Supervised Release, conditioned upon, *inter alia*, 90 days of custody in a Community Confinement Center in his district of residence. The Court also entered a forfeiture judgment, which was paid immediately. Mr. Correa completed the custodial portion of his sentence without incident, and continues to serve the remainder of the Supervised Release term. When the case is before the Court for a conference on May 26, 2022, he will have served more than a year of his term of supervision. He will thus be eligible for early termination under §3583(e)(1). For the reasons which follow, the Court should grant the motion. Mr. Correa's supervising Probation Officer informs me that her office does not oppose early termination.

Supervised release, and its precepts and rules, are distinct from the imprisonment portion of a criminal sentence, 18 U.S.C. 3583(a) ("The court, in imposing a sentence to a term of imprisonment for a felony or misdemeanor, *may* include as a part of the sentence a requirement that

the defendant be placed on a term of supervised release...) Supervised release is designed to achieve rehabilitative ends, and to assist offenders in transitioning from prison to life in the community. (*See* 18 U.S.C. §3553(a)(2)(D); see also S.Rep. No. 98–225, p. 124 (1983) ("the primary goal [of supervised release] is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release").

The Court already knows from the PSR, and the sentencing submissions that were filed more than a year ago, that Mr. Correa is and was what we hope everyone emerging from the criminal justice system will be: a law-abiding, responsible, productive individual, an individual who puts obligations to family and work first. This has continued since Court's imposition of sentence. Mr. Correa still operates his two home-improvement companies, First Impression Painting and First Impression Drywall; they have both grown significantly. He has more subcontractors working at more sites, and projected annual revenues from the companies has grown by more than 70% over the last year. He has crews working at more than two dozen work sites throughout Kansas and Missouri. To say that Mr. Correa works "full-time" in operating these businesses would be a vast understatement. And he has done that while at the same time reporting on schedule, and complying with the drug testing and weekly therapy conditions of Supervised Release.[1]



In short, Mr. Correa's reintroduction to the community following his custodial term has been a great success. He has lived under the strictures of Supervised Release for more than a year, and was under Pretrial Services supervision for ten months before that, and at all times was fully compliant.

Section 3583 provides that so long as a defendant has served at least one year of his term of supervised release, a district court may terminate the term "if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." The statute directs the court to consider many of the same factors that the court weighs when imposing the original sentence. Thus, the statute directs the court to make an evaluation based on 18 U.S.C. §3553(a)(1)(nature and circumstances of the offense and the defendant's history and characteristics), (a)(2)(B)(need to deter criminal conduct), (a)(2)(D)(need to provide the defendant with correctional

---

[1] Those conditions were terminated by the Court with the parties' consent on 10/13/2021 and 4/13/2022, respectively.

treatment), (a)(4)(the kinds of sentences and sentencing range established for defendants with similar characteristics under applicable guidelines and policy statements, (a)(5)(any pertinent policy statement of the Sentencing Commission in effect on the date of sentencing), and (a)(6)(need to avoid unwarranted disparities among similar defendants). Early termination of probation is within the discretion of the district court and may be warranted due to changed circumstances of a defendant, *United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997).

Given Mr. Correa's track record, I respectfully submit that it would be appropriate to terminate supervision at this time. The 3553 factors support this: there is no identifiable risk to either the public or any identified party, and a continued period of supervised release is unnecessary for deterrence, protection of the public or to reflect the seriousness of the offense for which the defendant has already completed his custodial term and the first year of his supervised release term. There is no further purpose, I believe, for the resources of the Probation Department to be spent on him. I therefore respectfully request that the Court terminate the term of Supervised Release.

Sincerely,

David Wikstrom

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          20 Cr. 18 (RMB)

JONATHAN CORREA,

              Defendant.
                                      Supervised Release
------------------------------x       Hearing

                                      New York, N.Y.
                                      April 13, 2022
                                      10:05 a.m.
Before:


                HON. RICHARD M. BERMAN,

                                      District Judge

                       APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  CHRISTY SLAVIK
     MOLLY BRACEWELL
     Assistant United States Attorneys

DAVID WIKSTROM
     Attorney for Defendant



Also Present:
Abby Maracic, USPO
**Melissa Goldsmith, USPO**
**Rashanna Robinson, LSCSW**
```

1           (Case called)

2           THE COURT:  Good morning, everybody.  This is
3  Judge Berman.  This is one of our regular supervised release
4  hearings.

5           Our last such hearing was held on January 24, 2022.
6  I'm going to make the transcript of the last hearing court
7  Exhibit A to today's proceeding.  And just by way of
8  background, Mr. Correa, as you all know, is being supervised in
9  Kansas.  That is his district of residence.

10          And during the last hearing, we all were thrilled to
11 learn that Mr. Correa was fully compliant with the terms and
12 conditions of his supervised release.  He was attending
13 therapy.  He was gainfully employed.  He owns his own
14 construction business called First Impression.  The majority of
15 the work of First Impression appears to be residential, new
16 residential, housing.

17          In March, and, namely, March 22, 2022, I received a
18 memo from the probation department requesting that the
19 condition of supervision for therapeutic counseling be
20 suspended.

21          I had, at an earlier date, terminated the special
22 condition of supervised release relating to substance abuse
23 treatment but directed also that we continue random drug
24 testing.

25          I'm going to make the March 22, 2022, memo from

1  probation Court Exhibit B to today's hearing.  That memo
2  states, in part, that Mr. Correa began therapeutic services
3  with Roshanna Robinson on or about November 10, 2021.
4         And he has attended sessions on a weekly basis in
5  accordance with Ms. Robinson -- this is a quote from her I
6  think.  She said that:  "Mr. Correa has been challenged to
7  critically think situations, thought processes, and behavior
8  patterns and has been really receptive to the therapeutic
9  process."  She goes on to say that she believes at this point
10 that he is rehabilitated and recommends that the court-mandated
11 therapy be suspended.
12        There was also, if I'm not mistaken, some
13 discussion -- perhaps this is the time to have the discussion,
14 or at least begin the discussion, if people feel it's
15 appropriate to consider early termination of supervision.  So
16 what I thought I would do today is we have those issues on the
17 table.
18        First I'm going to ask Christine Murray to swear in
19 the probation officers who are on the call and hear from each
20 of them on both of these issues, all these issues, that is to
21 say, therapy, early termination, anything else you'd like to
22 raise as well.
23        Let's do that.  And then we'll see where that takes
24 us.
25        THE DEPUTY CLERK:  Yes, Judge.

1           Officers Goldsmith and Maracic, please raise your
2  right hands.
3           (Probation officers sworn)
4           THE COURT:  So who wishes to go first?
5           MS. MARACIC:  This is Officer Maracic.  I can go
6  first, your Honor.
7           THE COURT:  Okay.  That would be great.
8           MS. MARACIC:  Mr. Correa has been attending his
9  therapy as recommended, and we have not had any issues with
10 that thus far.
11          In regards to early release, on May 24, 2022, he will
12 have been on for one year.  And at that point, we could
13 consider early release on our end.
14          THE COURT:  And that's because the statute says that
15 one can terminate early, however, so long as there has been one
16 year of supervision under supervisee's belt.
17          Is that right?
18          MS. MARACIC:  Yes.  That's correct.
19          THE COURT:  And do you have a thought -- I won't hold
20 you to it.  But it sounds like he's a good potential candidate
21 for early termination.
22          By the way -- I don't want to put any words in
23 anybody's mouth -- I'm open to hearing from each of you and all
24 of you if you wish to be heard.
25          MS. GOLDSMITH:  Your Honor, this is Melissa Goldsmith

1  with the probation office in Kansas City, Kansas.  Good
2  morning.  How are you doing?
3             THE COURT:  Good morning.  How are you?
4             MS. GOLDSMITH:  I'm doing wonderful.  I'm just here
5  with Abby to assist.  I have nothing to add.  He has been doing
6  very well on supervision up to this point.
7             THE COURT:  I'm very interested in the whole
8  supervised release process.  And my feeling is that when you
9  all think or if you all determine that early termination is
10 warranted, that's fine.
11            I'm also of the mind that expiration at the normal
12 term of supervised release, when it comes about and if there
13 have been no issues, no problems, as it sounds like there are
14 none right now, and supervision terminates, as I say, in the
15 normal course, that's fine with me too.  I consider both those
16 processes to be successful supervision.
17            In other words, if it's early, I think that's great.
18 And if it's just at the end of the term of supervision, in this
19 case, I think the unexpired term was a little more than two
20 years of supervision, maybe two years and three months,
21 something like that.  If we go to that point in time, that
22 works for me as well because I think both are successful in my
23 opinion.
24            Do you have any thoughts?  I know it's not at the
25 one-year mark.

1    Do you have any thoughts?  Or is it premature to make
2    that kind of prediction?
3         MS. GOLDSMITH:  I think we can certainly state that he
4    has been compliant with all the conditions of supervision.  He
5    contacts us when we've asked him.  He reports as directed.
6    We've had absolutely no issues with him, and he is a low-risk
7    individual.  He is assessed as low-risk.
8         We can still have contact when needed and if we have
9    any questions.  At this point, we will certainly entertain it
10   when it comes to that year.  But at this point, he has
11   certainly proven to us that he is compliant and successful on
12   supervision.
13        THE COURT:  While I have you here, I know pretty
14   detailed how supervision works here in New York in the Southern
15   District of New York.  I don't know, frankly, in other
16   districts if other probation departments in other districts
17   focus on early termination or just normal-course termination.
18   I'd be curious if you have sort of a little overview of what
19   the practice is out in Kansas.
20        MS. GOLDSMITH:  Well, I can share with you that we do
21   answer the questions.  That is one of the most popular
22   questions that individuals that are under supervision have with
23   us.
24        We explain to them that they would need to be on at
25   least one year and compliant with all conditions.  And if they

1  get to that point, we would recommend to the public
2  defenders -- would recommend them to the public defenders, and
3  they would assist them in filing those motions.
4          We don't typically get involved until the judge asks
5  us for an opinion or what our position is regarding that
6  motion.  I will say sometimes they're good candidates for early
7  termination.  Sometimes individuals are wanting it and probably
8  don't deserve it.  So we will definitely discuss that with the
9  judge once that motion is filed.
10         THE COURT:  Okay.  Do you happen to know or do you
11 keep overall statistics about what percentage gets terminated
12 early versus normal course?
13         MS. GOLDSMITH:  You know, I know we probably have the
14 statistics, but I don't know them off the top of my head.  But
15 I could certainly send that to you.
16         THE COURT:  That would be interesting, and I would
17 find it very helpful, if you can.
18         MS. GOLDSMITH:  Yes.  I will send it to your chambers
19 as soon as I can get it.
20         THE COURT:  All right.  That's just great.
21         Let's hear from Mr. Correa.
22         From your point of view, how's your life going, so to
23 speak?
24         THE DEFENDANT:  Besides the normal difficulties of
25 work on a day-to-day basis, everything's going pretty well.

1  Yeah.  Everything's going pretty smoothly.
2         THE COURT:  Are you busy in your business,
3  construction?
4         THE DEFENDANT:  Yeah.  We're extremely busy in our
5  business right now.
6         THE COURT:  Meaning?
7         THE DEFENDANT:  Just normal struggles.  It's hard to
8  find help and material shortages and whatnot, so those kind of
9  struggles.  But that's what comes with owning your own
10 business.
11        THE COURT:  Is there a big demand for new construction
12 out there?
13        THE DEFENDANT:  Currently, yes.  Our housing market
14 here has exploded in the last three years.  And as of right
15 now, it doesn't really show any signs of slowing down, even
16 with the interest rates going up a percent or 2 here recently.
17 So it's really good.  It's really good for everybody here in
18 Kansas City.
19        THE COURT:  Is it too difficult to get supplies,
20 for example, or not?
21        THE DEFENDANT:  Currently typically a house here in
22 Kansas City, an average house in Kansas City, should take about
23 nine to ten months' construction time.  And right now, they're
24 taking anything from 12 to 18 months in construction time
25 because of material shortages, labor shortages, and there's

1  such a high demand for everything.

2              THE COURT:  I got you.

3              THE DEFENDANT:  The biggest problem, in my opinion, is

4  just managing the clients' expectations properly because this

5  is such a changing environment on a day-to-day basis.

6              THE COURT:  So from my own observation, that's the

7  experience we're having.  We have a weekend place up in

8  Connecticut.  And during the pandemic, a lot of people from

9  New York, Boston, etc.  And many have moved into, on a

10 permanent basis, their weekend houses.

11             In those areas, the same thing that you're talking

12 about is happening.  There's a boom going on in sort of weekend

13 rental-type places.  And everybody is scrambling for supplies,

14 labor, the same kind of thing.

15             THE DEFENDANT:  Right.

16             THE COURT:  So it seems, as I say, like -- I'm not in

17 the business.  So I can't tell you.  But it seems like, in one

18 respect, it's a good thing.  In some other respects, "managing

19 expectations" is probably an excellent way to put it.

20             Anyway, it's happening here too by the way.

21             THE DEFENDANT:  Yeah.

22             THE COURT:  So this therapy, we've been talking about

23 it that you've been participating in, have you found that to be

24 helpful?

25             THE DEFENDANT:  Actually, yes.  Quite honestly, I'm

1  going to continue on with Roshanna Robinson on not so much as a
2  weekly basis but probably on a once-a-month basis because it's
3  nice to talk to somebody else to bounce ideas off and to figure
4  out how to handle situations because in my line of business, I
5  have to deal with thousands of personalities on a daily basis.
6        And sometimes it just proves really challenging to not
7  lose control of situations and know how to handle everybody's
8  personalities and what not.  And that's actually where Roshanna
9  has been helping me out quite a bit, to take myself out of the
10 equations and to try to look at it from other peoples'
11 perspectives and their points of views and to try to find a
12 viable solution for all of us to proceed forward.  So, yes.
13       THE COURT:  By the way, I think Ms. Robinson may have
14 joined our call.
15       Is that right?  Ms. Robinson, are you on there?
16       MS. ROBINSON:  Yes, your Honor.  I am here.
17       THE COURT:  We were just talking about the possibility
18 of continuing or not continuing with therapeutic counseling.
19 Mr. Correa says that he's interested -- I don't know how much
20 of it you've heard -- that he's interested in continuing
21 therapy on some basis, whether or not the probation department
22 is behind it or not.
23       And then we also talked -- I don't know if you heard
24 it -- about the possibilities of early termination of
25 supervised release.  It's something that a person who is being

1   supervised does not become eligible until they have completed a
2   year of supervision.  In his case, I think that comes up in
3   May.  So we were talking about that.
4              MS. ROBINSON:  Yes.
5              THE COURT:  And probation indicated that in Kansas,
6   sort of the application or the proposal for early termination
7   usually comes from defense counsel who I'm going to hear from
8   in a moment.
9              (Pause)
10             THE COURT:  That was my cellphone receiving some
11  emergency alert.  It's not of any concern.
12             Probation in Kansas was saying that that's something
13  that usually defense counsel initiate.  And I had this to
14  say -- and this is the way I feel about supervision.  I think
15  an early termination is great if it's, you know, appropriate.
16             By the way, I always seek to have unanimous consent,
17  so to speak, if it's going in that direction.  But I also think
18  that just being on supervision and it expiring at the end
19  date -- in this case, it was for two years and three months --
20  I consider that a success as well.
21             So I don't think that there's any need for pressure to
22  terminate early or not.  That is something I wouldn't mind
23  hearing.  If you have a thought about that or not, I'd be happy
24  to hear it.
25             MS. ROBINSON:  Well, your Honor, I believe that

1    Mr. Correa has worked really, really hard to achieve all goals
2    that have been set before him.  I think that it's a wonderful
3    idea if you were able to terminate early.
4             THE COURT:  And returning to the issue of the therapy,
5    in my experience, people often stay in therapy longer than he's
6    been on.  I don't think he's been a year yet.
7             Do you feel that the therapeutic objectives have
8    already been accomplished?
9             MS. ROBINSON:  Well, the therapeutic process is
10   actually tailored to the individual.  So the individual is the
11   person that can dictate how quickly or how slowly the process
12   is successful.
13            Mr. Correa has always been open, even asking questions
14   if he doesn't agree.  And I think that that's the best thing.
15   He is open for change.  He is open for different ideas and
16   viewpoints.  And I think that's one of the best things that
17   individuals receive in regards to therapy.
18            We have to come here with specific viewpoints and
19   stuff like that, but he has always been open to different
20   views.
21            THE COURT:  So here's what I was thinking:  He becomes
22   eligible I think May 26 or about there.
23            How about if we continue the current therapeutic
24   arrangement until then and then we, assuming that -- I think
25   it's Mr. Wikstrom who would make the application if there's

1 going to be one. And then we would get a sense, and we could
2 have another one of these hearings at the end of May and see
3 where things stand.
4       We might as well look at it in the bigger picture;
5 right? If we're going to terminate supervision altogether, if
6 it looks like it's going in that direction, I'm happy to do it,
7 if people think it's a good idea. And then whatever
8 relationship Mr. Correa wanted to continue with you,
9 Ms. Robinson, he would do on his own.
10       How does that sound?
11       MS. ROBINSON: I think that's a very good plan, sir.
12       THE COURT: Okay. David Wikstrom, are you on the
13 line?
14       MR. WIKSTROM: Yes, your Honor. I am.
15       THE COURT: So what's your thought about early
16 termination?
17       MR. WIKSTROM: Well, your Honor, as Mr. Correa's
18 lawyer, I'm not going to say anything negative on the trend
19 that I've already picked up over the last 20 minutes chatting
20 with the Court and the probation officer and the therapist out
21 in Kansas.
22       I wrote a lengthy memo a year ago in which I already
23 described Mr. Correa as -- he already is what we hope people
24 can become after getting involved in the criminal justice
25 system -- gainfully employed, a family man, hard-working,

1  law-abiding.  The offense conduct happened a long time before.
2  Nothing has really changed the correctness of that assertion.
3  In fact, the probation department reaffirmed it.
4           I had two thoughts, however:  One is that it is
5  appropriate to terminate supervision just because the resources
6  of the probation department are limited and they should more
7  effectively be used with people who need it more than John
8  Correa does.
9           And in terms of continuing the therapy for another
10 month, of course we have no objection.  It's just that mandated
11 on a weekly basis creates sort of scheduling and work-related
12 issues.
13          I hesitate to call them hardships.  Therapy is kind of
14 a benefit in ways that employment isn't.  I'm sure he's
15 benefited from his sessions with Roshanna.  In fact, he intends
16 to continue to do that.
17          It just makes life easier not to have to do it on a
18 regular, court-ordered weekly basis.  He's going to undertake
19 another month of it.  It would be wrong to call it a hardship.
20          Since he's going to be continuing therapy anyway, I
21 would query the need to have it court-mandated on a weekly
22 basis for whatever duration exists on the supervised release
23 term.
24          THE COURT:  So here's what I thought about that:  I'm
25 going to leave that up to Ms. Robinson and Mr. Correa.  I'm not

1  going to lift the condition. But I'll give them the
2  opportunity, if they feel that it can be less than once a week,
3  or whatever they come up with.
4          I would like that though to continue under the Court
5  auspices until we take a look at the issue of early termination
6  and see if it's going to happen and everything and all the
7  court conditions come to an end.
8          MR. WIKSTROM: Yes, your Honor.
9          THE COURT: So that's what I prefer to do.
10         Let me just hear from the government, the prosecutor,
11 if you have a thought about where this is heading.
12         MS. SLAVIK: Yes, your Honor. This is Christy Slavik
13 for the government. It's been helpful for the government to be
14 debriefed on Mr. Correa's supervision, and the government is of
15 course pleased to hear that his supervision is going well.
16         The government's position is that the supervising
17 probation officers and therapeutic service providers are in the
18 best position to provide the Court with this information. And
19 the government is happy to reconvene at the end of May, as
20 proposed by the Court, to revisit this issue of early
21 termination.
22         THE COURT: That would be great. That is what I would
23 like to do.
24         Let's give you a date for the end of May or early
25 June, and that will be sort of a milestone. We'll reconvene at

1     that time and see what everybody's feeling is then.
2                Christine, do you have a date for us at the end of
3     May?
4                THE DEPUTY CLERK:  Yes, Judge.  We originally had
5     scheduled May 26 at 9:00 a.m.  So that date and time is still
6     available.
7                THE COURT:  That works.  That is from one of our prior
8     hearings.  We did set that date.
9                Is that a good date for everybody, starting with
10    probation?
11               MS. MARACIC:  Yes, your Honor.
12               THE COURT:  And how about, Ms. Robinson?  Can you make
13    it?
14               MS. ROBINSON:  Yes, your Honor.
15               THE COURT:  And, Mr. Correa, does that work for you?
16               THE DEFENDANT:  Yes, your Honor.
17               THE COURT:  And how about David Wikstrom?  Is that
18    okay with you as well?
19               MR. WIKSTROM:  Yes.  That's fine, Judge.
20               THE COURT:  Good.  So we can do another telephonic
21    call and see how things are going.  I think that's it, unless
22    somebody wants to add anything for today.
23               Hearing nobody, I think we can be adjourned.  It looks
24    like everything is moving smoothly and in a good direction.
25               As I said before about supervision, I think it's very

1  helpful.  In this case, I think that Mr. Correa has made it a
2  good experience for him and for everybody else for that matter.
3           I'm happy to consider early termination.  I'm happy to
4  consider normal termination which would probably be the better
5  part of another year or so, what you all come to agree upon.
6           And, David, if you write into the Court, if you're
7  planning to do that toward the end of May, it would be useful
8  if you touch base with Ms. Robinson and with probation and of
9  course with Mr. Correa and also with Christy Slavik and see if
10 you have consensus.
11          MR. WIKSTROM:  Yes.  I will do that, your Honor.  I
12 will get a motion returnable I guess on the 26th well in
13 advance so we all have time to weigh in on it.
14          THE COURT:  Sounds great.  Good to talk to you all.
15 We'll talk again on May 26.  Thanks a lot, everyone.
16          (Adjourned)
17
18
19
20
21
22
23
24
25